## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FIRST AMERICAN TITLE | * |
| INSURANCE COMPANY | |
| t/o/u/ and t/u/o | * |
| MICHAEL MCINTYRE AND | |
| SUSAN MCINTYRE | * |
| 1801 K Street, N.W., Suite 200K-1 | |
| Washington, D.C. 20006 | * |
| | Civil Action No.: _____ |
| Plaintiffs, | * |
| | |
| v. | * |
| | |
| VICTORIA MANAGES | * |
| 314 Carmody Hills Drive | |
| Capitol Heights, MD 20743 | * |
| | |
| Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \*

### COMPLAINT

Plaintiff First American Title Insurance Company t/o/u and t/u/o Michael and Susan McIntyre, by and through its attorneys, Council, Baradel, Kosmerl & Nolan, P.A., Michael N. Russo, Jr., and Stephen A. Oberg, files this Complaint against Defendant Victoria Manages ("Manages"), and for cause states as follows:

### PARTIES

1. Plaintiff, First American Title Insurance Company ("First American") is a California corporation with its principal place of business in Santa Ana, California. First American maintains local offices for real property insurance underwriting and claims management located at 1801 K Street, N.W., Suite 200K-1, Washington D.C. 20006.

2. Michael and Susan McIntyre ("the McIntyres") are individual residents of the District of Columbia.

3.  Victoria Manages is, upon information and belief, a resident of the State of Maryland.

### JURISDICTION

4.  Diversity Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the McIntyres reside in the District of Columbia, First American is a California corporation with a principal place of business in California, and Manages is a resident of the State of Maryland.

5.  The amount in controversy, exclusive of costs and interest, exceeds seventy-five thousand dollars ($75,000.00).  28 U.S.C. § 1332.

6.  Venue is proper in this Court under 28 U.S.C. § 1391 because the events giving rise to this action arose in the District of Columbia.

### FACTS COMMON TO ALL COUNTS

7.  The McIntyres and Manages entered into negotiations regarding the purchase of the Subject Property during the Spring of 2005.

8.  On April 7, 2005, Sandy Spring recorded its Deed of Trust with respect to the Subject Property with the Recorder of Deeds for the District of Columbia as Instrument Number 2005048673.  *See* Deed of Trust from Manages to Sandy Spring Bank, dated March 8, 2005, attached hereto and incorporated herein as Exhibit 1.

9.  On April 30, 2005, the McIntyres and Manages entered into a contract of sale for the Subject Property.

10. Manages conveyed the Subject Property to the McIntyres by a Special Warranty Deed dated May 31, 2005 and recorded with the Recorder of Deeds for the District of Columbia on June 9, 2005 as Instrument Number 2005079319.  *See* Special Warranty

Deed from Manages to the McIntyres, dated May 31, 2005, attached hereto and incorporated herein as Exhibit 2. The sale price was six hundred, forty-two thousand, five hundred dollars ($642,500.00).

11. As part of the Settlement, Manages executed a "Seller's General Affidavit" stating that she had no notice of any unsatisfied liens on the Property other than those previously disclosed. *See* Seller's General Affidavit executed by Manages, dated May 31, 2005, attached hereto and incorporated herein as Exhibit 3.

12. In connection with the sale, and in reliance on the affidavit of Manages, Wells Fargo Bank made two loans to the McIntyres in the amounts of five hundred, fourteen thousand dollars ($514,000.00) and sixty-four thousand, two hundred fifty dollars ($64,250.00), for a total of six hundred, forty-two thousand dollars ($642,500.00), or the entire purchase price. To secure the loans, the McIntyres conveyed two deeds of trust on the Subject Property (the "Wells Fargo Bank Deeds of Trust").

13. First American issued title insurance to the McIntyres against any loss or damages incurred due to an encumbrance on the title of the Property. First American also issued title insurance for the first lien priority position of Wells Fargo Bank, N.A. in connection with two deeds of trust for the Property from the McIntyres in the amounts of five hundred fourteen thousand dollars ($514,000.00) and sixty-four thousand, two hundred fifty dollars ($63,250.00) respectively.

14. Manages never told the McIntyres or Wells Fargo Bank, N.A. about the Sandy Spring Deed of Trust, and she untruthfully executed an affidavit stating that she had no notice of any unsatisfied liens on the Property.

15. On August 16, 2006, Sandy Spring filed a Notice of Foreclosure, with respect to the Property and two other properties, 311 Douglas St., N.E., Washington, D.C. 20002 (the "Douglas Street Property"), and 3113 South Dakota Ave., N.E., Washington, D.C. 20018 (the "South Dakota Avenue Property"), in the District of Columbia Office of Tax and Revenue Recorder of Deeds.   The foreclosure sale was scheduled to occur on September 26, 2006.

16. Plaintiff attempted to contact Manages regarding the foreclosure, however, she failed or refused to respond.

17. On September 8, 2006, Kyle L. Terry, the present owner of the Douglas Street Property, filed a Complaint in the Superior Court for the District of Columbia [captioned *Terry v. Manages*, et al., Case No.:06ca6856] seeking to enjoin the foreclosure sale and alleging various claims against Manages.  Simultaneous with the filing of the Complaint, the owner of the Douglas Street Property also filed a Motion for a Preliminary Injunction.

18. On September 20, 2006, the McIntyres filed a Motion to Intervene as Plaintiffs in the action to enjoin the foreclosure sale.

19. On or about September 25, 2006, the parties to the Superior Court action, Kyle L. Terry, Louvenia Williams, Victoria Manages, Sandy Spring Bank, Martin L. Goozman, and the McIntyres entered into a settlement agreement.   This Agreement was memorialized in the form of a Consent Order As To Preliminary Injunction (the "Consent Order") presented to and entered by the Superior Court.  The Consent Order granted the McIntyres' Motion to Intervene and provided as follows: a) that Sandy Spring could proceed with the foreclosure sale with respect to the South Dakota Avenue Property; b) that Sandy Spring would bid up to two hundred thousand dollars ($200,000.00) on the

South Dakota Avenue Property; c)that if the foreclosure sale of the South Dakota Avenue Property results in a deficiency on the amount owed to Sandy Spring, the McIntyres and Kyle Terry agreed to split the deficiency 50/50 up to a total of one hundred fifty-six thousand dollars ($156,000.00); and d) that if the deficiency exceeded one hundred fifty-six thousand dollars ($156,000.00), Sandy Spring could proceed to foreclosure on the Property and the Douglas Street Property unless the McIntyres and the owner of the Douglas Street Property paid the entirety of the deficiency. *See* Consent Order As To Preliminary Injunction, dated September 25, 2006, attached hereto and incorporated herein as Exhibit 4.

20. On September 26, 2006, Sandy Spring proceeded with the foreclosure sale of the South Dakota Avenue Property. Sandy Spring purchased the South Dakota Avenue Property for a bid of two hundred thousand dollars ($200,000.00).

21. On October 10, 2006, pursuant to the terms of the Consent Order, First American, on behalf of the McIntyres, wired seventy-seven thousand, six hundred seventy-four dollars and eighty-eight cents ($77,674.88) to counsel for Sandy Spring. *See* Wire from First American to Sandy Spring, dated October 4, 2006, attached hereto and incorporated herein as Exhibit 5.

22. The terms of the insurance policies issued by First American to the McIntyres provide the title to the Property was insured against lien or encumbrance on the title. The terms of the policy further provide that First American agreed to pay all costs incurred in defense of the title to the Property.

23. First American, through counsel, attempted repeatedly to resolve this issue with Manages and apprise her of its claim against her; however, Manages failed to respond to First American's attempts to contact her.

24. By making payment on behalf of the McIntyres, First American is subrogated to their rights.

## COUNT I – FRAUD

25. First American incorporates all paragraphs of this Complaint herein in their entirety, as if set forth fully below.

26. Manages made a material false statement when she attested in her "Seller's General Affidavit" that "the Property will be, immediately post-closing, free from all leases[,] mortgages, taxes, assessments (special or otherwise), water charges and other liens and encumbrances, all of which items will or have been satisfied and paid at or before closing." *See* Exhibit 2 at ¶ 6.

27. When Manages made these false statements, she knew them that Sandy Spring held a Deed of Trust with respect to the Subject Property and that neither First American nor the McIntyres knew of the existence of the Sandy Spring Deed of Trust.

28. Manages intended First American and the McIntyres to rely on the material false statement to induce the McIntyres to complete their purchase of the Subject Property and to receive for herself the monies which should have gone to payoff Manages' debt to Sandy Spring and which would have required Sandy Spring to release its lien.

29. Manages acted with malice, hatred, and intent to defraud the McIntyres and First American.

30. First American and the McIntyres relied upon Manages material false statement in issuing a title insurance policy for the Subject Property and in consummating the purchase of the same.

31. First American's payment of seventy-seven thousand, six hundred seventy-four dollars and eighty-eight cents ($77,674.88) pursuant to the terms of the Consent Order was directly caused by Manages' fraudulent execution of the "Seller's General Affidavit" in which she failed to disclose Sandy Spring's Deed of Trust with respect to the Subject Property.

32. First American was caused to expend attorneys' fees to resolve the Sandy Spring claim against the Subject Property.

WHEREFORE, Plaintiff First American demands judgment against Defendant Manages

A. Awarding First American compensatory damages in the amount of one hundred thousand dollars ($100,000.00);

B. Awarding First American punitive damages in the amount of fifty thousand dollars ($50,000.00);

C. Attorney's fees, interest and costs; and

D. Such other relief as this Court may deem just and proper.


## COUNT II – NEGLIGENT MISREPRESENTATION

33. First American incorporates all paragraphs of this Complaint herein in their entirety, as if set forth fully below.

34. Manages represented in her "Seller's General Affidavit" that "the Property will be, immediately post-closing, free from all leases[,] mortgages, taxes, assessments (special or otherwise), water charges and other liens and encumbrances, all of which will or have been satisfied and paid at or before closing." *See* Exhibit 3 at ¶ 6.

35. Manages made the material statement with knowledge that it was false or with reckless disregard for its veracity.

36. Manages had no reasonable ground to believe that the statement was true because she knew that she had granted a lien to Sandy Spring and that neither First American nor the McIntyres knew about the Sandy Spring Deed of Trust.

37. Manages made the material false statement with an intent to induce First American's and the McIntyres' reliance upon the same. *See* Exhibit 3 at ¶ 14.

38. Neither First American nor the McIntyres knew that the statement was false.

39. Manages acted with malice, hatred, and intent to defraud the McIntyres and First American.

40. First American's payment of seventy-seven thousand, six hundred seventy-four dollars and eighty-eight cents ($77,674.88) pursuant to the terms of the Consent Order was directly caused by it's reliance on Manages' "Seller's General Affidavit" in which she failed to disclose Sandy Spring's Deed of Trust with respect to the Subject Property.

41. As a result of Manages' actions, First American incurred attorneys' fees in the Superior Court action.

WHEREFORE, Plaintiff First American demands judgment against Defendant Manages

A. Awarding First American compensatory damages in the amount one hundred thousand dollars ($100,000.00);

B. Awarding First American punitive damages in the amount of fifty thousand dollars ($50,000.00);

C. Attorney's fees, interest and costs; and

D. Such other relief as this Court may deem just and proper.

## COUNT III – BREACH OF SPECIAL WARRANTY DEED

42. First American incorporates all paragraphs of this Complaint herein in their entirety, as if set forth fully below.

43. On May 31, 2005, Manages provided the McIntyres with a Special Warranty Deed for the Property.

44. By providing the McIntyres with a Special Warranty Deed, Manages guaranteed the title against encumbrances arising during the period of her tenure of ownership of the Property.

45. Manages has breached the Special Warranty Deed by conveying the Sandy Spring Deed of Trust to the Property.

46. As a direct and proximate result of Manages' breach of the Special Warranty deed, First American suffered damages through its payment of seventy-seven thousand, six hundred seventy-four dollars ($77,674.88) pursuant to the terms of the Consent Order.

47. As a result of Manages' actions, First American incurred attorneys' fees in the Superior Court action.

WHEREFORE, Plaintiff First American demands judgment against Defendant Manages

A.  Awarding First American compensatory damages in the amount of one hundred thousand dollars ($100,000.00);

B.  Attorney's fees, interest and costs; and

C.  Such other relief as this Court may deem just and proper.

COUNCIL, BARADEL
KOSMERL & NOLAN, P.A.

By:        */s/ Michael N. Russo, Jr.*
Michael N. Russo, Jr., Esq.
D.C. Bar # 424712
Stephen A. Oberg, Esq.
D.C. Bar # 475925
125 West Street, Fourth Floor
Post Office Box # 2289
Annapolis, Maryland 21404

Annapolis: 410-268-6600
Baltimore: 410-269-6190
Washington: 301-261-2247

*Attorneys for Plaintiff*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| First American Title Insurance Company | Victoria Manages |

|  |  |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF — Orange County (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) — Prince George's NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Michael N. Russo, Jr<br>125 West Street, 4th Floor<br>Annapolis, Md 21404<br>410-268-6600 | |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| □ 410 Antitrust | □ 310 Airplane<br>□ 315 Airplane Product Liability<br>□ 320 Assault, Libel & Slander<br>□ 330 Federal Employers Liability<br>□ 340 Marine<br>□ 345 Marine Product Liability<br>□ 350 Motor Vehicle<br>□ 355 Motor Vehicle Product Liability<br>□ 360 Other Personal Injury<br>□ 362 Medical Malpractice<br>□ 365 Product Liability<br>□ 368 Asbestos Product Liability | □ 151 Medicare Act<br><br>Social Security:<br>□ 861 HIA ([1395ff)<br>□ 862 Black Lung (923)<br>□ 863 DIWC/DIWW (405(g)<br>□ 864 SSID Title XVI<br>□ 865 RSI (405(g)<br>Other Statutes<br>□ 891 Agricultural Acts<br>□ 892 Economic Stabilization Act<br>□ 893 Environmental Matters<br>□ 894 Energy Allocation Act<br>□ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ◉ E. General Civil (Other)  OR  ○ F. Pro Se General Civil |
|---|

| Real Property | Bankruptcy | Forfeiture/Penalty |  |
|---|---|---|---|
| □ 210 Land Condemnation<br>□ 220 Foreclosure<br>□ 230 Rent, Lease & Ejectment<br>□ 240 Torts to Land<br>□ 245 Tort Product Liability<br>□ 290 All Other Real Property<br><br>Personal Property<br>☒ 370 Other Fraud<br>□ 371 Truth in Lending<br>□ 380 Other Personal Property Damage<br>□ 385 Property Damage Product Liability | □ 422 Appeal 28 USC 158<br>□ 423 Withdrawal 28 USC 157<br><br>Prisoner Petitions<br>□ 535 Death Penalty<br>□ 540 Mandamus & Other<br>□ 550 Civil Rights<br>□ 555 Prison Condition<br><br>Property Rights<br>□ 820 Copyrights<br>□ 830 Patent<br>□ 840 Trademark<br><br>Federal Tax Suits<br>□ 870 Taxes (US plaintiff or defendant<br>□ 871 IRS-Third Party 26 USC 7609 | □ 610 Agriculture<br>□ 620 Other Food &Drug<br>□ 625 Drug Related Seizure of Property 21 USC 881<br>□ 630 Liquor Laws<br>□ 640 RR & Truck<br>□ 650 Airline Regs<br>□ 660 Occupational Safety/Health<br>□ 690 Other<br><br>Other Statutes<br>□ 400 State Reapportionment<br>□ 430 Banks & Banking<br>□ 450 Commerce/ICC Rates/etc.<br>□ 460 Deportation | □ 470 Racketeer Influenced & Corrupt Organizations<br>□ 480 Consumer Credit<br>□ 490 Cable/Satellite TV<br>□ 810 Selective Service<br>□ 850 Securities/Commodities/ Exchange<br>□ 875 Customer Challenge 12 USC 3410<br>□ 900 Appeal of fee determination under equal access to Justice<br>□ 950 Constitutionality of State Statutes<br>□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Fraud committed in connection with the sale of real property in the District of Columbia

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 100,000.00    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 2/5/07    SIGNATURE OF ATTORNEY OF RECORD    [signature] D.424712

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.** CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

**IV.** CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.** CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.** RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

AFTER RECORDING, PLEASE RETURN TO:
Professionals Title & Escrow Co.
2730 W. University Blvd., #804
Wheaton, MD 20902
Case No. 2-11995

Return To:
SANDY SPRING BANK
9112 Guilford Rd. Suite 2
Columbia, MD 21046

Title Insurer: Ticor Title Insurance Company of FL
Lot 0824, Square 4315   AND
Lot 0184, Square 0509   AND
Lot 0108, Square 3554.

———————————[Space Above This Line For Recording Data]———————————

# DEED OF TRUST

0405095

MIN 100157300000053200



LT1-5-2005048673-1



LT2-0-0-16

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    March 8th, 2005
together with all Riders to this document.

**(B) "Borrower"** is  Victoria Manages, Sole Owner

Borrower's address is 1614 New Jersey Ave NW, Washington, DC 20001
. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is  SANDY SPRING BANK

Lender is a  a Maryland Corporation
organized and existing under the laws of   The United States of America
Lender's address is 17801 Georgia Avenue, Olney, MD 20832

**(D) "Trustee"** is  Stanley L. Merson and S. Lynne Pulford

Trustee's address is 9112 Guilford Rd.  Suite 2, Columbia, MD  21046

0405095
DISTRICT OF COLUMBIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
VMP ®  -6A(DC) (0205)      Form 3009  1/01
(rev. 2/02)
Page 1 of 15      Initials:
VMP MORTGAGE FORMS - (800)521-7291



EXHIBIT
1

5/16

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated   March 8th, 2005
The Note states that Borrower owes Lender  Five Hundred Twenty Two Thousand Fifty
and  no/100.                                                                    Dollars
(U.S. $    522,050.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   March 8th, 2036          .

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

 

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the District of Columbia:
THE SOUTH 40 FOOT FRONT ON SOUTH DAKOTA AVENUE BY FULL DEPTH OF LOT 9 IN
BLOCK NUMBERED 9 IN A.P. PARDON AND OTHER'S SUBDIVISION OF LAND NOW
KNOWN AS "WOODRIDGE" AS PER PLAT RECORDED IN LIBER COUNTY 10 AT FOLIOS
59 AND 60 IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA.

Blanket (parcel 2) 311Douglas Street, NE
                   Washington, DC 20002
                   Tax id #3554-0108
Blanket (parcel 3) 1614 New Jersey Avenue, NW
                   Washington, DC 20001
                   Tax id # 0509-0184
Parcel ID Number:    4315-0824                           which currently has the address of
3113 South Dakota Ave NE                                                          [Street]
Washington, District of Columbia 20018      [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

0405095
 -6A(DC) (0205)                          Page 3 of 15                Initials _____     Form 3009 1/01 (rev. 5/02)

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's



obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly  payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien

which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance

 

proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien

which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.



(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

0405095

  ·6A(DC) (0205)

Page 11 of 16



Form 3009 1/01 (rev. 5/02)

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

 

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.00 % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.




BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
Jonathan C. Levy, Esq., Witness                   Victoria Manages               -Borrower

                                                  1614 New Jersey Ave NW
                                                  Washington, DC 20001          (Address)

_____                   _____ (Seal)
                                                                                 -Borrower

                                                                                 (Address)

_____ (Seal)            _____ (Seal)
                          -Borrower                                              -Borrower

                          (Address)                                              (Address)

_____ (Seal)            _____ (Seal)
                          -Borrower                                              -Borrower

                          (Address)                                              (Address)

_____ (Seal)            _____ (Seal)
                          -Borrower                                              -Borrower

                          (Address)                                              (Address)

0405095
-6A(DC) (0205)                     Page 14 of 15                     Form 3009 1/01 (rev. 5/02)

State of Maryland,    County of Frederick

~~DISTRICT OF COLUMBIA~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~

                                                          said jurisdiction

    I,    Kimberly W. King                         , a Notary Public in and for the ~~DISTRICT~~
~~of Columbia~~, do hereby certify that Victoria Manages

personally known to me as the person(s) who executed the foregoing instrument bearing date of 8th
day of    March 2005        , personally appeared before me in said District and acknowledged said
instrument to be his/her/their act and deed, and that he/she/they executed said instrument for the purposes
therein contained.

    Witness my hand and official seal this    8th    day of    March 2005

                                    _Kimberly W. King_ (Seal)

                    Notary Public, ~~XXXX~~ Kimberly W. King

                    KIMBERLY W. KING
                    NOTARY
                    PUBLIC
                    FREDERICK CO., MD



File Number: **2-11995-04**

# FULL LEGAL

Exhibit "A" to Deed of Trust

(*Parcel 1)
The South 40 foot front on South Dakota Avenue by full depth of lot 9 in Block numbered 9 in A.P. Pardon and other's subdivision of land now known as "WOODRIDGE", as per plat recorded in Liber County 10 at folios 59 and 60 in the Office of the Surveyor for the District of Columbia.
NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia for assessment purposes as Lot 824 in Square 4315.
AND
(**Parcel 2)
Lot 108 in Square 3554, in a subdivision made by Gertrude L. Reed, as per plat recorded in Liber No. 80 at folio 133 among the records of the Office of the Surveyor of the District of Columbia.
AND
(**Parcel 3)
Lot numbered One Hundred Eighty-four (184) in Square Five Hundred and Nine (509) in a subdivision made by Lewis E. Bruenineer, as per plat recorded in Liber 28 at folio 94 among the Records of the Office of the Surveyor for the District of Columbia.



Doc# 2005048673 Fees:$3007.05
04/07/2005   12:44PM Pages 16
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

RECORDING                    $       118.00
RECORDATION TAX FEE          $     2,882.55
SURCHARGE                    $         8.50





Mail To:
Federal Title & Escrow Company
5335 Wisconsin Ave., NW, #700
Washington, DC 20015

McIntyre/050695

THIS DEED is made on the 31st day of May, 2005, by and between **Victoria Manages, Sole owner**, party of the first part, and **Susan McIntyre and Michael McIntyre**, parties of the second part:

WITNESSETH, *that in consideration of Ten and no/100 Dollars ($10.00) and other good and* valuable consideration, the said party of the first part does hereby grant and convey unto **Susan McIntyre and Michael McIntyre,** parties of the second part, their heirs, successors and assigns, in fee simple as Tenants by the Entirety all that piece or parcel of land situate, lying and being in the District of Columbia described as follows to wit:

*Lot numbered One Hundred Eighty-four (184) in Square Five Hundred and Nine (509) in a subdivision made by Lewis E. Breuninger, as per plat recorded in Liber 28 at folio 94 among the Records of the Office of the Surveyor for the District of Columbia.*

AND the said party of the first part covenants that she will warrant specially the property hereby conveyed; and that she will execute such further assurances of said land as may be requisite.



EXHIBIT

2

ALL-STATE LEGAL®

WITNESS her hand and seal the day and year hereinbefore written.

Victoria Manages

DISTRICT OF COLUMBIA,        SS:

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, do hereby certify that Victoria Manages, known to me as the person(s) who executed the foregoing Deed bearing date on the 31 day of May, 2005, personally appeared before me in said jurisdiction and acknowledged the same to be her act and deed.

Given under my hand and seal this 31 day of May, 2005

Notary Public

My Commission Expires: _____

Helen H. Do
Notary Public, District of Columbia
My Commission Expires 0.14.20

RECORDING SURCHARGE                    $       20.00
RECORDATION TAX FEE                    $        6.50
TRANSFER TAX FEE                       $    7,064.75
                                       $    7,064.75

Doc# 2005079319 Fees:$14156.00
05/09/2005    12:55PM Pages 2
Filed & Recorded in Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

## SELLER'S GENERAL AFFIDAVIT

FTE File No.: 050695

The undersigned ("Seller"), being first duly sworn, states and affirms that:

1.  I/We am/are over the age of 18 years.

2.  I/We can be reached after settlement at the following address and telephone number:
    314 OAKWOOD HILLS DRIVE
    CAPITOL HGTS, MD 20743
    Phone: (202) 200-5173

3.  If this affidavit is made as authorized representative for a legal entity, I state that I am duly authorized to make this affidavit and have the requisite knowledge to make these statements.

4.  Seller is the owner of the Property known as:
    1614 New Jersey Avenue, NW, Washington, DC 20001 (herein "Property.")

5.  During the period that the Property has been in the Seller's possession, the possession has been peaceable and undisturbed, and the title thereto has never been disputed, questioned, or rejected, nor title insurance refused, to the best of my knowledge. I know of no facts by reason of which said possession or title might be called into question, or by reason of which any claim to any part of the Property or any interest therein adverse to me might be asserted.

6.  There are no federal tax claims or any liens assessed or filed against Seller. There are no judgments against Seller unpaid or unsatisfied entered in any court, nor actions pending affecting the Property, and the Property will be, immediately post-closing, free from all leases mortgages, taxes, assessments (special or otherwise), water charges and other liens and encumbrances, all of which items will or have been satisfied and paid at or before closing.

7.  There are no unpaid debts for plumbing fixtures, water heaters, floor furnaces, air conditioners, radio or television antennae, carpeting, rugs, lawn sprinkling systems, venetian blinds, window shades, draperies, electric appliances, fences, street paving, or any personal property or fixtures that are located on the Property and all labor and materials used in the construction or improvements on the Property have been paid for and there are now no unpaid labor or material claims against the improvements or the Property and no such items have been purchased on time payment contracts, and there are no security interests on the Property.

8.  No proceedings in bankruptcy have ever been instituted by or against Seller, nor has Seller at any time made an assignment for the benefit of creditors, nor an assignment, now in effect, of the rents of the Property or any part thereof, nor is there any pending or threatened litigation against any Seller; nor is any Seller the subject of any proceeding dealing with mental competency.

9.  I/We am/are ___✗___ married _____ unmarried



10.    No Seller has been known by any other legal name, except:
       _____

11.    The property ___ was/ ___ was not occupied by any tenants at the time of execution of the
       sales contract, nor since that date. If the property was occupied by tenants, the settlement
       sheet accurately reflects adjustments of rents and security deposits and notice is hereby
       given that Seller has complied with all provisions and requirements of the Title IV of the
       District of Columbia Law 3-86, "Rental Housing Conversion and Sale Act of 1980" as
       amended or supplemented, or any successor legislation. There is no pending or
       threatened litigation concerning present or former tenants in any way affecting the
       Property.

12.    Seller is not a nonresident alien for the purposes of U.S. income taxation and the address
       and Federal Identification Number of each Seller is accurate.

13.    Seller understands that this affidavit may be disclosed to the Internal Revenue Service,
       and that any false statement made may be punishable by fine, imprisonment, or both.

14.    This affidavit is executed with the knowledge that (a) it is made to induce the
       purchaser(s) to complete this transaction; (b) it is made to induce the settlement attorney
       and the title insurance company to issue its policy of title insurance covering the
       Property; (c) the purchaser and/or lender in this transaction is/are relying upon the
       representations contained herein in purchasing same or lending money thereon and would
       not purchase same or lend money thereon unless said representations were made. The
       undersigned agrees to indemnify and hold harmless Federal Title & Escrow Company
       for, from and against any claims, expenses, demands or causes of action, including, but
       not limited to, reasonable attorneys fees, it may incur as a result of its reliance on the
       statements made under oath and subject to penalties of perjury herein.

15.    Seller agrees to pay on demand to the purchasers and/or their lenders, their successors
       and assigns, all amounts secured by any and all liens not disclosed herein, as well as any
       other debts arising from the ownership of the Property, together with all costs, loss and
       attorney's fees that said parties may incur in connection with such liens or obligations,
       provided said liens or obligations either currently apply to the Property, or to a part
       thereof, or are subsequently against said Property and are created by Seller, or known to
       Seller, or have an inception date prior to the consummation of this transaction. Seller
       indemnifies and holds harmless the settlement attorney and the title insurance company
       underwriting this transaction, for all damages, including reasonable attorney's fees, in
       connection with the resolution of matters covered by this affidavit.

16.    Seller, in consideration of FEDERAL TITLE AND ESCROW COMPANY disbursing
       the proceeds for the sale, recording any conveyancing or security instruments among the
       Land Records and issuing policy(ies) of title insurance, hereby agree to appoint
       FEDERAL TITLE AND ESCROW COMPANY, its employees, officers and/or assigns
       as my/our agent and Attorney-in-Fact Fact with power to correct, execute, acknowledge,
       initial, deliver, or re-sign any forms or other documents as may be necessary to complete
       the closing, record any conveyancing documents or security instruments and issue
       policy(ies) of title insurance, which appointment shall survive settlement and the closing
       of the loan (if applicable) for a period of ten (10) business days, and shall insure to the
       benefit of FEDERAL TITLE & ESCROW COMPANY, its successors and assigns, and

be binding upon the heirs, devisees, personal representatives, successors, and assigns of the undersigned.

17.    In the event that, post-closing, real property taxes, general or special, are claimed to be due by the District of Columbia, Seller, shall within three (3) days of notice of the sum due, render full payment to the taxing authority.  In the event the sum due is not timely paid, Seller shall be liable for all costs and expenses of collection, including reasonable legal fees, and the time of FEDERAL TITLE & ESCROW COMPANY employees, until the total sum due, including unpaid taxes, interest and penalties is paid.

18.    Sellers understands and hereby acknowledges that FEDERAL TITLE & ESCROW COMPANY is the *settlement agent* working to complete the transactions and honor a contractual agreement between the parties.  ***Tobin, O'Connor & Ewing,  general counsel for FEDERAL TITLE & ESCROW COMPANY, does not represent any one party to this transaction as his/her/its individual legal counsel.***  All parties are encouraged to retain their own legal counsel in connection with the above-referenced transaction.

Witness my/our hand(s) and seal(s) this _____ day of **May 2005.**

_____    SSN: _____
Victoria Manages

    SSN: _____

_____

DISTRICT OF COLUMBIA:

I, the undersigned, a Notary Public in and for the aforesaid jurisdiction, do hereby certify that Victoria Manages   appeared personally before me and, known to me as the person(s) who executed the foregoing instrument in said jurisdiction on the date stated herein, acknowledged said instrument to be his/her/their/its act and deed, executed or the purposes therein contained.

Witness my hand and seal this _____ 31 _____ day of **May 2005.**

_____ [SEAL]
Notary Public
My commission expires:

Helen H. Do
Notary Public, District of Columbia
My Commission Expires 8-14-2008

RECEIVED OCT 0 2 2006

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

1179.144

KYLE L. TERRY                       :
     And
LOUVENIA W. WILLIAMS                :
Trustee
                                    :

        Plaintiffs                  :

v.                                  :  **Civil Action No.: 06-6856**
                                       Calendar 14
VICTORIA MANAGES                    :  Judge Retchin
     And
SANDY SPRING BANK                   :
     AND
MARTIN L. GOOZMAN                   :
Substitute Trustee
                                    :

        Defendants                  :

## CONSENT ORDER AS TO PRELIMINARY INJUNCTION
(September 25, 2006)

Upon consideration of the Motion for Preliminary Injunction filed by Kyle L. Terry and Louvenia W. Williams and the Motion to Intervene as Plaintiffs filed by Michael and Susan McIntyre, and the response filed thereto by the Defendants Martin L. Goozman and Sandy Spring Bank, and the consents of the parties as is evidenced by the signatures of their respective counsel attached hereto, it is on this 25TH day of September, 2006 by the Superior Court of the District of Columbia;

Order docketed 9/28/06 and copies mailed from chambers to Parties indicated above on 9/29/06.

1



EXHIBIT
4



Case: 2006 CA 006856 R(RP)

**ORDERED**, that Michael and Susan McIntyre's Motion to Intervene be and hereby **GRANTED**; and it is further;

**ORDERED**, that Michael and Susan McIntyre shall henceforth proceed as Plaintiffs in this action, and it is further;

**ORDERED**, that the Defendants, Martin L. Goozman and Sandy Spring Bank, shall proceed on September 26, 2006, with only the foreclosure of the property known as 3113 South Dakota Avenue, Washington, D.C. and it is further;

ORDERED, that Defendant Sandy Spring Bank will agree to bid up to two hundred thousand dollars ($200,000) on the property at 3113 South Dakota Ave. Washington, D.C. and it is further;

**ORDERED**, that in the event the foreclosure sale of the 3113 South Dakota Avenue, Washington, D.C. property results in a deficiency on the amount due Sandy Spring Bank on its loan secured by a deed of trust on said property, Plaintiffs Michael and Susan McIntyre and Kyle Terry, through his title insurer, will agree to split the deficiency 50/50 up to a total of one hundred and fifty-six thousand dollars ($156,000) and it is further;

ORDERED, that in the event the deficiency exceeds the $156,000 amount, Defendant Sandy Spring Bank can proceed to foreclosure unless within 30 days from the sale unless McIntyre

2

and Terry, through his insurer, pay the entirety of the deficiency owed, and it is further

ORDERED that in the event that the deficiency exceeds $156,000, McIntyre and Terry retain the right to challenge the validity of the Sandy Spring Bank's deed of trust

**ORDERED**, that in the unlikely event the Defendant, Sandy Spring Bank, proceeds to foreclosure on either or both the 311 Douglas Street, S.E. Washington, D.C. property or 1614 New Jersey Avenue, N.W., Washington, D.C. property, this Court shall retain jurisdiction to adjudicate Plaintiffs' claims based on equitable subordination, and the net proceeds resulting from the foreclosure of either or both the 311 Douglas Street, S.E. Washington, D.C. property and 1614 New Jersey Avenue, N.W., Washington, D.C. property, to the extent contraverted, shall be held in escrow by Jeffrey W. Bernstein, Esquire, in an interest bearing attorney escrow account until further order of this Court or upon written instructions from the Plaintiffs, Kyle L. Terry, Louvenia W. Williams, Michael McIntyre and Susan McIntyre, and the Defendant, Sandy Spring Bank.

_____
Judge Judith  E. Retchin

**AGREED AND CONSENTED TO:**


Jeffrey W. Bernstein, Esquire /scm
Goozman, Bernstein & Markuski
9101 Cherry Lane, Suite 207
Laurel, Maryland 20708
Attorney for Sandy Spring Bank


Samantha Mazo, Esquire /scm
Deborah Baum, Esquire
Pillsbury Winthrop Shaw, Pittman LLP
2300 N. Street, N.W.
Washington, D.C. 20037-1128
Attorneys for Kyle Terry & Louvenia Williams


Michael N. Russo, Esquire /scm
Stephen O. Oberg, Esquire
Council, Baradel, Kosmeri & Nolan, P.A.
125 West Street, 4th Floor
P.O. Box 2289
Annapolis, Maryland 21401
Attorneys for Michael and Susan McIntyre

4



From: Luc, Tien
**Sent:** Wednesday, October 04, 2006 9:52 AM
**To:** Asero, Debbie S
**Subject:** RE: URGENT WIRE REQUEST

Debbie, please confirmation below:

## Bank of America Direct

### Payments Inquiry Results

**Payment Type:**

**PI Reference:**

**Value Date:**
**Debit Account:**
**Payment Amount:**
**Service Conf:**

Payment 1 of 1
**Beneficiary ID:**

**Beneficiary:**      GOODMAN BERNSTEIN
**Beneficiary Bank ID:**
**Status:**      Payment Completed

EXHIBIT 5
ALL-STATE LEGAL®